**No. 26-1029**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SZ DJI TECHNOLOGY CO., LTD., and DJI SERVICE LLC,

*Petitioners,*

*v.*

FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order
of the Federal Communications Commission

## PETITIONERS' OPPOSITION TO MOTION TO DISMISS

TRAVIS LeBLANC
ELIZABETH B. PRELOGAR
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
(202) 842-7800
tleblanc@cooley.com
eprelogar@cooley.com

*Counsel for Petitioners SZ DJI Technology Co., Ltd.
and DJI Service LLC*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................ii

INTRODUCTION ......................................................................... 1

BACKGROUND ...........................................................................3

ARGUMENT ...............................................................................8

I.    This Court Should Not Dismiss DJI's Challenge To The FCC's Action Immediately Requiring DJI To Stop Selling New Products In The United States................................9

    A.    DJI Seeks Review of a Final FCC Order. ...........................10

    B.    The FCC's Contrary Arguments Misconstrue the Jurisdictional Statutes. ........................................11

    C.    The FCC's Arguments Raise Serious Constitutional Concerns. ..................................................19

II.    The Court Should Hold The Case In Abeyance. ...........................23

CONCLUSION ...........................................................................26

CERTIFICATE OF COMPLIANCE ....................................................27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acura of Bellevue v. Reich,*
  90 F.3d 1403 (9th Cir. 1996)...................................................................15

*Am. Fed'n of Gov't Emps. Loc. 1 v. Stone,*
  502 F.3d 1027 (9th Cir. 2007)................................................................20

*Blue Ridge Env't Def. League v. NRC,*
  668 F.3d 747 (D.C. Cir. 2012)................................................................10

*Buckley v. Valeo,*
  424 U.S. 1 (1976)...................................................................................21

*Ctr. for Biological Diversity v. Bernhardt,*
  946 F.3d 553 (9th Cir. 2019)..................................................................20

*Environmental, LLC v. FCC,*
  661 F.3d 80 (D.C. Cir. 2011)..................................................................13

*Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010)...............................................................................22

*Hikvision USA, Inc. v. FCC,*
  97 F.4th 938 (D.C. Cir. 2024) ..................................................................4

*International Telecard Ass'n v. FCC,*
  166 F.3d 387 (D.C. Cir. 1999).................................................................14

*L.A. SMSA Ltd. P'ship v. FCC,*
  70 F.3d 1358 (D.C. Cir. 1995)................................................................18

*Lucia v. SEC,*
  585 U.S. 237 (2018).........................................................................21, 22

*MacLean v. DHS,*
  543 F.3d 1145 (9th Cir. 2008).................................................................10

*N.Y. Stock Exchange LLC v. SEC,*
  2 F.4th 989 (D.C. Cir. 2021) ..................................................................25

ii

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Nat'l Ass'n of State Util. Consumer Advocates v. FCC,*
457 F.3d 1238 (11th Cir. 2006) .......................................................... 25

*NTCH, Inc. v. FCC,*
877 F.3d 408 (D.C. Cir. 2017) ............................................................ 14

*Sackett v. EPA,*
8 F.4th 1075 (9th Cir. 2021) .............................................................. 25

*Sierra Club v. NRC,*
825 F.2d 1356 (9th Cir. 1987) ............................................................ 15

*Sw. Bell Tel. Co. v. FCC,*
116 F.3d 593 (D.C. Cir. 1997) ............................................................ 17

*TeleSTAR, Inc. v. FCC,*
888 F.2d 132 (D.C. Cir. 1989) ............................................................ 15

*United States v. Lamont,*
330 F.3d 1249 (9th Cir. 2003) ............................................................ 19

*Webster v. Doe,*
486 U.S. 592 (1988) ............................................................................ 20

## Constitutional Provision

U.S. Const. art. II, § 2, cl. 2 .................................................................. 21

## Statutes & Regulations

Secure Networks Act (codified as 47 U.S.C. §§ 1601-1609)
Pub. L. No. 116-124, 134 Stat. 158 (2020) ........................................... 4
§ 1601(a) ............................................................................................. 3-4
§ 1601(b) ........................................................................................... 4, 12
§ 1601(b)(1) ........................................................................................... 4

iii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

National Defense Authorization Act for Fiscal Year 2025
  Pub. L. No. 118-159, 138 Stat. 1773 (2024) ........................................ 4
  § 1709(a)(1) ......................................................................................... 4
  § 1709(b)(1) ....................................................................................5, 12

28 U.S.C. § 2342(1) ...................................................................................9

47 U.S.C.
  § 402............................................................................................. 19, 20
  § 402(a) ...............................................................................................9
  § 405(a) ......................................................................................... 14, 16
  § 155...................................................................................................20
  § 155(c)(7) .................................................................................... 13, 19

47 C.F.R.
  § 1.104(b) .............................................................................................7
  § 2.903.................................................................................................4

## Other Authorities

FCC Public Notice, DA 25-1086, *Public Safety & Homeland
  Security Bureau Announces Addition of Uncrewed Aircraft
  Systems (UAS) & UAS Critical Components* (Dec. 22, 2025) ........ 6, 12

FCC, DA 26-223, *Procedures and Other Requirements
  Regarding Petition for Reconsideration Filed by SZ DJI
  Technology Co., Ltd. and Application for Review Filed by
  Autel Robotics, Co., Ltd.*, Dkt. No. 26-22 (FCC Mar. 6, 2026). ..........23

Letter from Adam Welsh to Secretary Kristi Noem et al.
  (Mar. 3, 2025) .......................................................................................5

Order on Recons., *In re China Unicom (Americas) Operations
  Ltd.*, DA 25-453, WC Dkt. No. 18-89 (FCC May 28, 2025) ................17

Pet. for Recons., *In re SZ DJI Tech. Co.*, ET Dkt. No. 26-22
  (FCC Jan. 21, 2026) ......................................................................... 7, 13

iv

## INTRODUCTION

This case concerns a Federal Communications Commission (FCC or Commission) decision that took effect the same day it issued on December 22, 2025, and banned all new products produced by SZ DJI Technology Co., Ltd. and its affiliates (collectively, DJI) from being marketed in or imported into the United States. That agency action has caused immediate and grave harm: DJI stands to lose more than $1.5 billion this calendar year, and American first responders, energy companies, and businesses that rely on DJI's industry-leading drone technology can no longer purchase new products. The FCC's action violates the Constitution and federal law, yet the FCC's motion to dismiss asks this Court to endorse the remarkable proposition that the agency can insulate its decision from any judicial review—now and potentially forever—if the agency simply fails to act on a reconsideration petition that it contends DJI was required to file.

The FCC's jurisdictional arguments are wrong on both the law and the big picture. The FCC's action is a final decision for purposes of the relevant jurisdictional statutes because it immediately prohibits DJI from marketing and importing its products, with no further agency action

1

needed to effectuate that ban. None of the arguments that the FCC identifies require courts to wait to review the constitutionality of that immediate penalty on DJI and its users. And accepting the FCC's view that it can ban entire categories of products from the United States without any judicial review of that decision would defy common sense and raise serious constitutional concerns.

There is no need for this Court to accept the FCC's untenable view, or even to decide these complicated questions at this juncture. DJI filed a petition for review in this Court to ensure that DJI's rights are protected in the event that the FCC does not act on its reconsideration motion—and because there is an open question as to the deadline to seek judicial review of the FCC's decision. But because briefing before the FCC is still underway, DJI proposed to the FCC that the parties seek to hold this case in abeyance pending further FCC action. That measured approach will preserve this Court's resources, protect DJI's rights and American consumers' interests, and ensure the agency cannot permanently evade judicial review. The Court should decline the FCC's request to consider the jurisdictional issues now and should instead hold

2

this case in abeyance for six months, with the parties directed to file a status report at the six-month mark.

## BACKGROUND

1. DJI is the largest privately owned manufacturer of recreational and commercial drones in the world. DJI has several U.S. affiliates that together employ technicians and other personnel who provide services in connection with drones sold in North America. DJI's drones are a critical tool for consumers, with state and local government agencies, businesses, and hobbyists alike relying on its industry-leading products. For example, police departments, fire departments, and other first responders in the United States frequently use DJI drones to enhance emergency response times, reduce operational costs, and improve decision-making. As another example, energy and utility companies use DJI's drones to support worker safety and to inspect and maintain power plants and other critical equipment.

2. In 2020, Congress enacted the Secure and Trusted Communications Networks Act (Secure Networks Act), which directs the FCC to maintain a list (Covered List) of "covered communications equipment and services" that pose a national security risk. 47 U.S.C.

3

§ 1601(a); *see* Pub. L. No. 116-124, 134 Stat. 158 (2020) (codified as amended at 47 U.S.C. §§ 1601-1609). Under the Secure Networks Act, the FCC "shall place" communications equipment on the Covered List "if and only if" it "poses an unacceptable risk to the national security of the United States or the security and safety of United States persons." 47 U.S.C. § 1601(b), (b)(1). Products on the Covered List cannot be "marketed in or imported into the United States." *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 942 (D.C. Cir. 2024); *see* 47 C.F.R. § 2.903.

The National Defense Authorization Act for Fiscal Year 2025 (FY2025 NDAA) expanded on the composition of the Covered List in a manner explicitly targeting DJI. *See* Pub. L. No. 118-159, 138 Stat. 1773 (2024). As relevant here, Section 1709(a)(1) of the FY2025 NDAA directs that "[n]ot later than one year after the date of the enactment of this Act, an appropriate national security agency shall determine" if "communications or video surveillance equipment . . . produced by . . . DJI Technologies" "pose an unacceptable risk to the national security of the United States or the security and safety of United States persons." *Id.* § 1709(a)(1), (a)(1)(A). If the "appropriate national security agency determines that any of the communications equipment or services

4

specified in subsection (a)(1) present an unacceptable risk," then the "Commission shall place such communications equipment or services on the covered list." *Id.* § 1709(b)(1), (b)(1)(A).

**3.** After the FY2025 NDAA's enactment, DJI made clear to the public and to the Executive Branch that it was prepared to demonstrate to an appropriate national security agency that its top-of-the-line products are safe in every respect. On March 3, 2025, for example, DJI's head of global policy sent a letter to five Executive Branch leaders explaining that DJI "welcome[d]" any agency to fully and fairly investigate whether DJI's products pose a safety or security risk in the United States. *See* Letter from Adam Welsh to Secretary Kristi Noem et al. (Mar. 3, 2025), https://perma.cc/P9CC-K7QE. DJI never received a response. And as far as DJI is aware, no national security agency has specifically investigated DJI's products.

Instead, on December 22, 2025, one day before Section 1709's one-year period expired, the FCC's Public Safety and Homeland Security Bureau issued a public notice updating the Covered List. The Bureau added all "uncrewed aircraft systems (UAS) and UAS critical components produced in foreign countries," as well as "all communications and video

surveillance equipment and services listed in Section 1709(a)(1) of the [FY2025 NDAA]." FCC Public Notice, DA 25-1086, *Public Safety & Homeland Security Bureau Announces Addition of Uncrewed Aircraft Systems (UAS) & UAS Critical Components* 1-3 (Dec. 22, 2025), https://perma.cc/2ESJ-9PQS (December 22 Listing). The Bureau made these additions based on a purported national security assessment issued the day before "by an Executive Branch interagency body with appropriate national security expertise." *Id.* at 1. Even though that purported national security assessment did not mention DJI or analyze any DJI products, the Bureau found that the interagency assessment was "a specific determination of an unacceptable risk to the national security of the United States or the security or safety of United States persons pursuant to" the Secure Networks Act and the FY2025 NDAA. *Id.* at 2. The Bureau concluded that the Commission was "required to place the equipment and services . . . on the Covered List." *Id.* After updating the list, the Commission sent letters to Telecommunications Certification Bodies invoking the December 22 Listing to set aside equipment authorizations for DJI products that had been granted in the 30 days prior to the listing.

6

As a result of the listing and the associated set-asides, DJI faces a potential loss of $1.5 billion in 2026. The Commission has set aside authorizations for 14 existing DJI products, including five UAS models and nine non-UAS models, which DJI estimates will result in a loss of $700 million. DJI projects that it will lose an additional $860 million if it cannot sell in the United States the 25 new UAS and non-UAS models it plans to launch in 2026.

**4.** In accordance with the FCC's rules, *see* 47 C.F.R. § 1.104(b), DJI petitioned the FCC for reconsideration of the Bureau's decision adding DJI's products to the Covered List. *See* Pet. for Recons., *In re SZ DJI Tech. Co.*, ET Dkt. No. 26-22 (FCC Jan. 21, 2026), https://perma.cc/VV7H-6LHP. The petition urged that the addition of DJI's products to the List exceeded the FCC's statutory authority and violated DJI's constitutional rights. The FCC has invited public comment on the petition. There is no statutory or regulatory requirement that the FCC act on DJI's petition for reconsideration within any set time.

**5.** Because DJI and consumers are harmed every day the FCC's listing remains in effect and because there is an open question as to the deadline to seek judicial review of a listing, DJI filed a petition for review

7

in this Court on February 20, 2026. On February 25, DJI proposed to the FCC that the parties jointly seek to hold this case in abeyance for six months to allow the FCC the chance to act on DJI's petition. The FCC did not substantively respond until March 6, when it stated that it intended to file a motion to dismiss that same day.

## ARGUMENT

The relevant jurisdictional statutes and precedents confirm that DJI properly invoked this Court's jurisdiction to challenge an FCC action that causes DJI and its customers acute and immediate harm. The FCC's contrary arguments are self-contradictory, have staggering real-world consequences, and raise serious constitutional concerns. But there is no need for the Court to delve into any of those issues: Rather than adjudicating the FCC's motion, the Court should simply hold the case in abeyance to allow the Commission time to act on DJI's pending motion without prejudicing DJI's ability to obtain judicial review if the agency declines to act at all. Assuming the FCC acts in a timely fashion, this Court will never need to opine on the jurisdictional questions presented in the Commission's motion—preserving the Court's resources and DJI's rights.

**I.** **This Court Should Not Dismiss DJI's Challenge To The FCC's Action Immediately Requiring DJI To Stop Selling New Products In The United States.**

The Hobbs Act provides that this Court has jurisdiction to review "all final orders of the Federal Communications Commission made reviewable by" an FCC-specific statute, 47 U.S.C. § 402(a).  28 U.S.C. § 2342(1).  And the FCC-specific provision states, as relevant here, that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter" may be litigated in the court of appeals.  47 U.S.C. § 402(a).  Thus, the jurisdictional question before the Court is whether DJI seeks to enjoin a "final order" of the FCC.

The answer is yes.  The FCC has purported to ban DJI from selling new products in the United States.  That ban has immediate and devastating effects on DJI and its customers and so is final for purposes of the Hobbs Act.  And although the FCC raises various objections to that straightforward analysis, its arguments misconstrue the relevant statutory text, misunderstand the critical precedents, and raise serious constitutional and practical concerns.

## A.    DJI Seeks Review of a Final FCC Order.

The challenged FCC order is "final" for purposes of the Hobbs Act. Under that statute, an order is final if it "imposes an obligation, denies a right, or fixes some legal relationship, usually at the consummation of an administrative process." *Blue Ridge Env't Def. League v. NRC*, 668 F.3d 747, 753 (D.C. Cir. 2012) (citation omitted). "And in the context of administrative adjudications, 'a final order is normally one that disposes of all issues as to all parties.'" *Id.* (citation omitted) (alterations omitted). An agency's "classification of its own order as a 'final order' does not control [this Court's] review." *MacLean v. DHS*, 543 F.3d 1145, 1149 (9th Cir. 2008) (per curiam).

The FCC's public notice adding DJI to the Covered List—and thus prohibiting DJI from selling new products within the United States— plainly meets the Hobbs Act's finality requirements. It "denies a right" to DJI by preventing it from obtaining new equipment authorizations. It "fixes some legal relationship" by adding DJI to the Covered List and thus making it unlawful for DJI to import its new products into the United States or market them in this country. And it disposes of "all issues as to all parties" now seeking the Court's review. All of these consequences

10

take effect without any further "decision process" within the FCC: There is no requirement, for example, that the full Commission approve the Bureau's action for it to have the force and effect of law.

The injuries from the challenged decision are not merely abstract. The FCC's action is currently harming DJI, which suffers financial injury every day it cannot import and market its industry-leading products. Indeed, DJI estimates that it may lose $1.5 billion this year as a result of the FCC's ruling. And the ruling is also harming users of DJI's products, which include law enforcement, other first responders, and utility companies maintaining critical infrastructure. *See supra* at 3. Under the FCC's order, those users cannot purchase new DJI drone products for the many important purposes for which those products are used. Those here-and-now consequences make the challenged ruling final for purposes of the Hobbs Act.

**B. The FCC's Contrary Arguments Misconstrue the Jurisdictional Statutes.**

The FCC does not deny that the challenged order has immediate legal and practical effect. Rather, it rests on three technical arguments for why—even though DJI is immediately harmed by an FCC ruling it

11

asserts is unconstitutional—the federal courts are closed to that claim. None of those arguments provides a basis to dismiss this action.

*First*, the FCC insists that "action taken by staff in a subordinate Bureau" is not "a final order of the Commission itself." Mot. 10. The problem with that argument is that the "subordinate Bureau" acted on the Commission's behalf under its delegated authority. The challenged ruling reads: "[W]e conclude that the Commission is required to place the equipment and services in this determination on the Covered List," and so "[w]e update the Covered List to include" DJI's products. December 22 Listing at 2.

The FCC's argument is also self-defeating because, if the Bureau is not the Commission for purposes of federal statutory law, then the agency action is illegal. The FCC derives its authority to issue the challenged order from the FY2025 NDAA and the Secure Networks Act. But the NDAA states that "the Commission shall place such communications equipment or services on the covered list." NDAA § 1709(b)(1)(A). And the Secure Networks Act likewise provides that only "the Commission" may place equipment or services on the Covered List. 47 U.S.C. § 1601(b). The FCC cannot credibly claim that the Bureau qualifies as

12

the "Commission" for purposes of those statutes but not for purposes of the FCC's judicial-review provision.

*Second*, the FCC insists that 47 U.S.C. § 155(c)(7) deprives this Court of jurisdiction. *See* Mot. 9-10. That provision states that "[t]he filing of an application for review under this subsection"—that is, a request that the full Commission address the relevant ruling—"shall be a condition precedent to judicial review." DJI fully complied with that section: In its petition for reconsideration, it made clear that the full Commission should review the Bureau's Order. *See* Pet. for Recons., *supra*, at 7 (urging that "the full Commission" should reject the listing). That satisfies the "condition precedent" required under the statute.

In arguing to the contrary, the FCC asserts—without support in the statutory text—that DJI must not only "fil[e]" an application for review of the Bureau's ruling, but must also wait until the full Commission issues a decision on the application. *See* Mot. 11. But most of the cases the FCC cites do not support that reading. *Environmental, LLC v. FCC*, 661 F.3d 80 (D.C. Cir. 2011), for example, states that "the full FCC must have the opportunity to review all cases and all aspects of those cases"— not that it must actually avail itself of that opportunity. *Id.* at 84; *see*

13

*also NTCH, Inc. v. FCC*, 877 F.3d 408, 412 (D.C. Cir. 2017) (dismissing petition for review because "[a]t no time during the proceeding before the Bureau did NTCH ever seek review by the Commission"). Were it otherwise, the FCC could permanently evade judicial review by declining to act on the applications presented to the full Commission.[1]

*Third*, the FCC asserts that DJI's petition for review is "incurably premature" because DJI is also asking the Commission to reconsider its ruling. Mot. 9. The Commission does not seek to ground that argument in any statutory text, and its argument is in serious tension with the language discussed immediately above. It cannot be that Congress explicitly made "the filing of an application" a "condition precedent" for judicial review, but also implicitly made the filing of such application a

---

[1] The one case that goes further is *International Telecard Ass'n v. FCC*, 166 F.3d 387 (D.C. Cir. 1999) (per curiam). But the court there failed to explain how its analysis could be reconciled with the text of 47 U.S.C. § 155(c)(7). Moreover, the court did not consider the text of 47 U.S.C. § 405(a), which, as explained below, creates uncertainty as to whether a petition for reconsideration filed with the FCC tolls the time period for filing a petition for review with the court. And *International Telecard* did not confront the pernicious consequence of allowing an agency to impose substantial burdens on regulated parties while simultaneously denying them any judicial forum for relief through inaction on a petition for full Commission review. As out-of-circuit precedent, *International Telecard* is not binding and should not be adopted here.

14

*bar* on judicial review until the Commission acts, with no requirement that the Commission respond in a reasonable timeframe.

The FCC's cited precedents do not support its position, either. *Sierra Club v. NRC*, 825 F.2d 1356 (9th Cir. 1987), held that a party could not seek judicial review of an order that "was procedural in nature and merely denied the request for an immediate decision and ordered expedited briefing." *Id.* at 1361. That case is miles away from this one, where the challenged ruling imposes significant economic consequences with immediate effect.

The Commission's remaining cases state only that a reconsideration petition deprives this Court of jurisdiction to issue a merits ruling while the reconsideration petition is "pending," *Acura of Bellevue v. Reich*, 90 F.3d 1403, 1407 (9th Cir. 1996), and that if the agency then issues a decision on reconsideration, the Court lacks jurisdiction to review the prior order and must instead review the new decision, *TeleSTAR, Inc. v. FCC*, 888 F.2d 132, 133 (D.C. Cir. 1989) (per curiam). Neither proposition supports the FCC's request that the Court dismiss this action now. As explained more fully below, while the FCC's action has an immediate and substantial negative effect on DJI and its

15

customers, DJI is prepared to wait for the FCC to rule on its petition for reconsideration within a reasonable timeframe without asking this Court to rule on the merits in the interim.

Nevertheless, DJI deemed it necessary to file this petition now to protect its rights for two reasons. First, DJI did not want to risk waiting to seek review only for the government to argue that DJI's petition was untimely. There is genuine ambiguity as to whether a request for reconsideration filed with the FCC tolls the time for filing a petition for review with this Court. The governing statute states that "[t]he time within which a petition for review must be filed" shall "be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of." 47 U.S.C. § 405(a). And the statute elsewhere describes the "action complained of" as the same action that an aggrieved party can ask the FCC to "reconsider." *Id.*

Given that language, a possible reading of the statute would require a party to file a petition for review in court within 60 days of the FCC's decision, even if the party also seeks reconsideration of that decision by the Commission. And while some courts have held that the filing of a petition for reconsideration suspends the running of this 60-day period,

16

*see, e.g.*, *Sw. Bell Tel. Co. v. FCC*, 116 F.3d 593, 596-97 (D.C. Cir. 1997), this Circuit has not addressed that question. Given the paramount importance of this case to DJI and its customers, DJI filed this petition to ensure no time bar would prevent this Court from reaching the merits of DJI's constitutional claims if that becomes necessary.

Second, DJI fears that the FCC may seek to evade judicial review of its unconstitutional listing decision by declining to act on the petition for reconsideration in a timely fashion. Those fears are not hypothetical: The FCC recently delayed almost three years in resolving a similar petition for reconsideration of a Bureau decision adding products to the Covered List. *See* Order on Recons., *In re China Unicom (Americas) Operations Ltd.*, DA 25-453, WC Dkt. No. 18-89 (FCC May 28, 2025) (denying petition for reconsideration filed Oct. 20, 2022). A comparable delay would cause immense harm to DJI and its users. Thus, while DJI intends to give the FCC the opportunity to address its reconsideration petition within a reasonable timeframe, the Commission should not be permitted to pocket veto that request while insulating its action from any judicial review. At some point, the FCC will have effectively denied the

17

petition through inaction, thus rendering it proper for this Court to proceed with its consideration of this petition for review at that time.

Accordingly, the only thing "premature" is the FCC's insistence that this Court decide this jurisdictional question now. Mot. 1. The FCC cites no case that addresses whether a court has jurisdiction over a previously filed petition for review if a regulated party withdraws a reconsideration petition due to lengthy inaction by the FCC or urges the court to deem the reconsideration petition effectively denied. And the FCC has previously argued that "a party who seeks agency reconsideration must persevere indefinitely, on pain of losing forever its right to judicial review of the agency's initial order," because withdrawing the petition for reconsideration does not restart the appeal clock. *L.A. SMSA Ltd. P'ship v. FCC*, 70 F.3d 1358, 1360 (D.C. Cir. 1995) (per curiam). Given that position, it is difficult to see how the FCC can seriously maintain that the Court should act on its motion now rather than wait to see how this controversy develops.

18

## C. The FCC's Arguments Raise Serious Constitutional Concerns.

This Court should forbear deciding these jurisdictional questions for another reason: The FCC's interpretation of the governing statutes raises serious constitutional problems, and "longstanding principle[s] of judicial restraint . . . require[] [courts to] avoid reaching constitutional questions in advance of the necessity of deciding them." *United States v. Lamont*, 330 F.3d 1249, 1251 (9th Cir. 2003) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988)).

According to the FCC, a subordinate Bureau can ban all of DJI's new products from the United States, and DJI cannot obtain judicial review of its constitutional claims challenging that decision until the Commission acts, which it has no obligation to do in any timely fashion. Specifically, the FCC reads 47 U.S.C. § 155(c)(7) and 47 U.S.C. § 402 to bar an aggrieved party from seeking judicial review of a Bureau order on constitutional grounds unless and until the party seeks review by the full Commission and the Commission decides to act on that request. The FCC, in other words, can deny DJI a judicial forum for its constitutional claims—and insulate the Bureau's decision from any review—simply by sitting on the reconsideration request.

19

If that position were correct, it would raise significant concerns under *Webster v. Doe*, 486 U.S. 592 (1988), and its progeny. In *Webster*, the Supreme Court recognized that "'serious constitutional question[s]' . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* at 603. Accordingly, the Court held that "where Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear." *Id.* Applying *Webster*, courts have consistently rejected interpretations of statutes that would effectively deprive parties of judicial review of constitutional claims absent "specific language" demonstrating Congress's "inten[t] to foreclose" such review. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561 (9th Cir. 2019); *see Am. Fed'n of Gov't Emps. Loc. 1 v. Stone*, 502 F.3d 1027, 1035 (9th Cir. 2007) (rejecting interpretation of statute that would bar review of constitutional challenges to termination of TSA screeners). Those principles likewise counsel against reading 47 U.S.C. § 155 and 47 U.S.C. § 402 to empower the FCC to deprive DJI of a judicial forum for its constitutional challenge by refusing to take action on its request for reconsideration.

20

The FCC's jurisdictional position would also create significant doubt that the Bureau is constituted consistent with the Appointments Clause. The Appointments Clause requires "Officers of the United States" to be appointed by the President, courts, or "Heads of Departments." U.S. Const. art. II, § 2, cl. 2. An individual functions as an "officer" for purposes of the Appointments Clause if he exercises "significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam). "Principal officers" exercise significant authority without supervision inside the Executive Branch; "'inferior officers' are officers whose work is directed and supervised at some level" by principal officers. *Edmond v. United States*, 520 U.S. 651, 663 (1997).

Under the FCC's view, the members of the Bureau exercise immense, unreviewable power and thus would qualify as principal, or at a minimum, inferior officers of the United States. By making additions to the Covered List, the Bureau has asserted the authority to ban broad categories of products—with only minimal connection to telecommunications—from being marketed in or imported into the United States. Decisions of that scale have significant ramifications for

21

international commerce and negatively impact American consumers who rely on those products. And on the FCC's telling, the Bureau can take this action without affording the manufacturer any process prior to or after the decision, at least until the FCC decides to act (if it ever does so). *Cf. Lucia v. SEC*, 585 U.S. 237, 249 (2018) (recognizing that ALJ exercises significant authority where the SEC could decide against reviewing the ALJ decision at all, making the ALJ's decision the final, deemed action of the Commission). The Bureau members thus wield considerable power "in carrying out [their] assigned functions," particularly if the FCC is correct that their decisions can remain in effect indefinitely without any judicial review. *Id.* at 245.

The Bureau members, however, were not appointed in compliance with the procedures specified in the Appointments Clause. The President plainly did not appoint them. And although it appears the Chief of the Bureau may have been appointed by FCC Chairman Carr, there is no record that the Commission as a whole—the "Head of Department[]" within the meaning of the Appointments Clause, *see Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 512 (2010)—took any action with respect to his appointment. The Court

22

should therefore avoid reading the FCC's jurisdictional statutes to permit the Bureau to immediately and unreviewably ban products from the United States.

## II. The Court Should Hold The Case In Abeyance.

Instead of deciding these complex questions with potential constitutional implications at a preliminary stage without full briefing and argument, this Court should hold the case in abeyance for six months. That approach risks no harm to the FCC and has several important advantages.

*First*, abeyance will afford the FCC a full opportunity to decide DJI's petition. DJI filed its petition on January 21, 2026. *See* FCC, DA 26-223, *Procedures and Other Requirements Regarding Petition for Reconsideration Filed by SZ DJI Technology Co., Ltd. and Application for Review Filed by Autel Robotics, Co., Ltd.*, Dkt. No. 26-22 (FCC Mar. 6, 2026). The FCC ordered that any oppositions to DJI's petition were due by April 6, 2026, and that replies are due by May 11, 2026. *See id.* at 2. If this Court holds this case in abeyance until November 2026, the FCC will have had more than sufficient time to decide the petition and to address the serious harm to DJI and its users. If the full Commission

23

reaffirms the Bureau's unconstitutional listing, DJI will petition for review of the FCC's new ruling, and—once it receives confirmation that the FCC will not argue that DJI's new petition for review comes too late—will voluntarily dismiss this case.

*Second*, this limited abeyance will protect DJI's rights by preventing the FCC from endlessly delaying its resolution of the petition and depriving DJI of any opportunity for meaningful relief. As explained, each day that the listing is in effect, DJI suffers significant economic harm. If the FCC delays more than six months in deciding DJI's petition, DJI may then seek to proceed to briefing in this action, possibly in conjunction with dismissing its pending FCC petition. At that point, the parties could brief any remaining jurisdictional arguments.

*Third*, this approach will preserve the parties' and the Court's resources. If the FCC acts on the reconsideration petition during the abeyance period, there will be no need for this Court to decide the complex jurisdictional questions raised in this briefing. And if the FCC fails to act on the petition, that fact has the potential to affect the scope of the remaining jurisdictional questions at issue. This Court should not

reach out to decide the jurisdictional questions now—particularly where, as here, those questions have significant constitutional dimensions.

DJI accordingly raised the prospect of moving for a limited abeyance period with the FCC immediately after DJI filed its petition for review in this Court. Instead of providing its position on that request, the FCC waited two weeks and then filed this motion to dismiss. The FCC now claims that an abeyance would be improper and that this Court must immediately resolve its jurisdictional arguments. But not a single one of the FCC's cited cases (Mot. 11-12) analyzes whether a case must be dismissed immediately rather than held in abeyance—indeed, neither *Sierra Club* nor any of the other cited cases mentions abeyance at all. Without support in case law, the FCC provides scant reasoning for that demand, and logic refutes it: Even where a motion to dismiss for lack of jurisdiction has been filed, courts routinely enter orders for the purposes of managing their dockets, setting briefing schedules, or carrying the motion with the case to be briefed alongside the merits.[2] In that respect,

---

[2] *See, e.g.*, *Sackett v. EPA*, 8 F.4th 1075, 1082 n.4 (9th Cir. 2021) ("In an unpublished order, a motions panel denied the motion to dismiss without prejudice to EPA's renewing the argument in opposition."); *N.Y. Stock Exchange LLC v. SEC*, 2 F.4th 989, 992 (D.C. Cir. 2021) ("A motions panel of this court referred the Commission's motion to dismiss to

25

holding a case in abeyance is no different than granting a motion for an extension of time to file a brief. By deferring any substantive ruling in this case, as DJI proposed to the FCC and now suggests to this Court, there is no present need to consider the Court's jurisdiction.

## CONCLUSION

The Court should deny FCC's motion to dismiss, hold this case in abeyance for six months, and direct the parties to file a status report six months following the Court's order.

Dated: April 15, 2026

Respectfully submitted,

/s/ Travis LeBlanc
TRAVIS LEBLANC
ELIZABETH B. PRELOGAR
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
tleblanc@cooley.com

*Counsel for Petitioners SZ DJI Technology Co., Ltd. and DJI Service LLC*

---

the merits panel."); *Nat'l Ass'n of State Util. Consumer Advocates v. FCC*, 457 F.3d 1238, 1246 (11th Cir. 2006) ("[W]e ordered that the motions to dismiss . . . be carried with the case.").

26

# CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,244 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook.

Dated:  April 15, 2026                              Respectfully submitted,

                                                            */s/ Travis LeBlanc*
                                                            TRAVIS LEBLANC